*Exhibit A*

**AFFIDAVIT IN SUPPORT OF VERIFIED COMPLAINT FOR CIVIL FORFEITURE *IN REM* OF APPROXIMATELY $94,600.00 IN UNITED STATES CURRENCY, *et al.***

I, Matthew J. Rech III, being first duly sworn on oath, do hereby depose and say:

1.      I am employed as a Special Agent with the Internal Revenue Service - Criminal Investigation ("IRS-CI") and have been so employed since February 2006.  My responsibilities include investigating criminal violations of the Internal Revenue laws (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), the Money Laundering Control Act (Title 18, United States Code, Section 1956 and 1957), and related offenses.

2.      This affidavit is based upon my personal knowledge and investigation, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

3.      I submit this affidavit in support of a Verified Complaint for Civil Forfeiture in rem against the following defendant properties:

> A.      Approximately $94,600 in United States currency seized by the Milwaukee Police Department from the residence of Tyrone McMillian located at 6XXX W. Darnell, Brown Deer, Wisconsin, on or about July 6, 2011, and, on or about October 28, 2013, seized by the Internal Revenue Service pursuant to seizure warrant number 13-M-581 issued by the Honorable William E. Callahan, Jr., United States Magistrate Judge for the Eastern District of Wisconsin;

> B.      One 2005 Bentley Continental GT Coupe bearing vehicle identification number SCBCR63W65CO29162 seized by the Milwaukee Police Department from the residence of Tyrone McMillian located at 6XXX W. Darnell, Brown Deer, Wisconsin, on or about July 6, 2011, and, on or about October 28, 2013, seized by the Internal Revenue Service pursuant to seizure warrant number 13-M-582 issued by the Honorable William E. Callahan, Jr., United States Magistrate Judge for the Eastern District of Wisconsin;

> C.      One custom hand-made 3-D diamond shield pendant bearing the initials "HK" seized by the Milwaukee Police Department from the residence of

Tyrone McMillian located at 6XXX W. Darnell, Brown Deer, Wisconsin, on or about July 6, 2011, and, on or about October 28, 2013, seized by the Internal Revenue Service pursuant to seizure warrant number 13-M-583 issued by the Honorable William E. Callahan, Jr., United States Magistrate Judge for the Eastern District of Wisconsin;

D.    One ladies' Breitling custom black mother-of-pearl diamond watch seized by the Milwaukee Police Department from the residence of Tyrone McMillian located at 6XXX W. Darnell, Brown Deer, Wisconsin, on or about July 6, 2011, and, on or about October 28, 2013, seized by the Internal Revenue Service pursuant to seizure warrant number 13-M-584 issued by the Honorable William E. Callahan, Jr., United States Magistrate Judge for the Eastern District of Wisconsin; and

E.    One men's 10-karat yellow gold diamond bracelet seized by the Milwaukee Police Department from the residence of Tyrone McMillian located at 6XXX W. Darnell, Brown Deer, Wisconsin, on or about July 6, 2011, and, on or about October 28, 2013, seized by the Internal Revenue Service pursuant to seizure warrant number 13-M-585 issued by the Honorable William E. Callahan, Jr., United States Magistrate Judge for the Eastern District of Wisconsin.

4.    Based upon information I believe to be truthful and reliable, I submit that the following defendant properties were derived from proceeds traceable to an offense constituting a specified unlawful activity, namely, the interstate transportation of stolen property, in violation of 18 U.S.C. § 2314, which offense is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7) and 1961(1):

A.    Approximately $94,600 in United States currency;

B.    One 2005 Bentley Continental GT Coupe bearing vehicle identification number SCBCR63W65CO29162;

C.    One custom hand-made 3-D diamond shield pendant bearing the initials "HK";

D.    One ladies' Breitling custom black mother-of-pearl diamond watch; and

E.    One men's 10-karat yellow gold diamond bracelet.

2

5.      Based upon information I believe to be truthful and reliable, I further submit that the following defendant property was derived in part from proceeds traceable to an offense constituting a specified unlawful activity, namely, sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1591, which offense is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7) and 1961(1):  One custom hand-made 3-D diamond shield pendant bearing the initials "HK."

6.      Based upon information I believe to be truthful and reliable, I further submit that the following defendant properties were involved in money laundering transactions or attempted transactions in violation of 18 U.S.C. §§ 1956 and 1957:

    A.      One custom hand-made 3-D diamond shield pendant bearing the initials "HK";

    B.      One ladies' Breitling custom black mother-of-pearl diamond watch; and

    C.      One men's 10-karat yellow gold diamond bracelet.

### Background

7.      On July 6, 2011, officers from the Milwaukee Police Department (MPD) arrested Tyrone McMillian at his residence, 6XXX W. Darnell, Brown Deer, Wisconsin, and, pursuant to a state search warrant, searched his residence.  Items seized included the five defendant properties, and bank and credit card statements.

8.      The defendant properties were seized as evidence in a criminal investigation into Tyrone McMillian's suspected child prostitution activities.  The investigation ultimately led to an indictment, trial, and conviction of McMillian, in *United States v. Tyrone McMillian*, Case No. 11-CR-193 (E.D. Wis.), on seven counts of sex trafficking and coercion offenses, in violation of 18 U.S.C. §§ 1591, 1594, and 2422.

3

9.     During preparation for the trial of that case, agents discovered that McMillian had purchased the defendant properties using proceeds traceable to another crime that McMillian had committed, namely, causing stolen property worth over $5,000 to be transported in interstate commerce, in violation of 18 U.S.C. § 2314, via money laundering transactions, in violation of 18 U.S.C. §§ 1956 and 1957, or both.

### Fraud Investigation

10.     IRS-CI's fraud investigation shows that, between April 2011 and June 2011, McMillian caused cooperating witness #1 ("CW-1") to steal health supplements from a Texas company where CW-1 worked.  McMillian then caused those stolen health supplements to be sold to a company located in Bangkok, Thailand, and as part of the sale, caused those stolen health supplements to be transported from Texas to California for further transportation to Thailand.

11.     The financial investigation revealed that McMillian received $334,502.91 from the sale and interstate and international shipment of these stolen health supplements, and that McMillian then withdrew some of the proceeds as cash and transferred other proceeds to accounts he held in the names of other businesses, which transferred proceeds McMillian then used to buy expensive assets, including the following three defendant properties:  One 3-D diamond shield pendant bearing the initials "HK," which McMillian purchased for approximately $17,500; one ladies' Breitling custom black mother-of-pearl diamond watch, which McMillian purchased along with another ladies' Breitling custom pink mother-of-pearl diamond watch for approximately $15,980; and one 10-karat yellow gold diamond bracelet, which McMillian purchased for approximately $12,000.

4

**Statements Made By Tyrone McMillian**

12.     On July 8, 2011, MPD detectives interviewed Tyrone McMillian, upon advice of his rights, while he was in custody.  During that recorded interview, McMillian made the following statements.

13.     McMillian admitted that he had purchased the defendant 2005 Bentley Continental GT Coupe with cash and that he had registered the vehicle in the nominee name of "Ashley Knueppel."  McMillian admitted that he did so to disguise his ownership of the vehicle because of a child support lien against him.

14.     McMillian stated that he had investors who were looking to expand their businesses.  McMillian stated that a woman from Los Angeles, named "Rose," whose last name McMillian claimed not to know, had wired McMillian money from her Wells Fargo Bank account, and that a man named "Danny," whose last name McMillian also claimed not to know, had introduced McMillian to "Rose."  McMillian stated that "Danny" and "Rose" had wired McMillian money because they were investing in McMillian's music business, clothing line, and rim-wipe businesses.  McMillian stated that all the money was wired into his personal account and that he then transferred it into his business account.  McMillian stated that all of the transfers had come from Rose.

**Statements Made By Cooperating Witness #1 (CW-1)**

15.     On July 1, 2013, CW-1 made the following statements to IRS Special Agents regarding the theft of protein supplement products from USPLabs and the subsequent sale of those stolen protein supplement products.

16.     During February 2011, CW-1 met McMillian in Dallas, Texas.  Soon thereafter, CW-1 began an intimate relationship with McMillian.  CW-1 saw McMillian during trips that

5

McMillian made from his residence in Wisconsin to Dallas. CW-1 was employed at USPLabs in Dallas, Texas. CW-1's duties at USPLabs included handling accounts payable, processing customer orders, and assembling and packaging shipments at the warehouse. Sometime during early spring 2011, CW-1 and McMillian decided to steal protein supplements from the USPLabs warehouse and then ship and resell the stolen product.

17.     CW-1 and McMillian contacted cooperating witness #3 (CW-3) via a fake email account, identified as BrianWilliams@yahoo.com, regarding the possible sale of protein supplements to CW-3. CW-1 contacted CW-3 because CW-1 knew that CW-3 had recently lost the privilege of purchasing product directly from USPLabs. McMillian and CW-1 both communicated to CW-3 via the fake email account about the eventual coordination of shipments. But McMillian made all the telephone calls to CW-3 to discuss product and product availability.

18.     CW-1 used USPLabs' warehouse forklift to physically remove product for at least three, but not more than four shipments. CW-1 stole the product after the warehouse had closed for the day and loaded the product onto rented Penske trucks. The stolen product was then shipped via R&L Carriers from Texas to a California warehouse for future shipments by DeltaMax to CW-3 in Thailand.

19.     McMillian and CW-3 agreed that CW-3 would make a one-half payment before delivery of each product shipment and the other half payment after CW-3 received the product shipment. All of the shipments of stolen protein supplements were paid for via domestic wire transfers that a contact (unknown to CW-1) in California sent directly to McMillian's bank account. The stolen product that McMillian caused to be shipped to CW-3 included Jack3D, Oxy elite, and various other amino acid formulas.

20.     One additional USPLabs employee, R.M., who is now deceased, was also initially aware of the theft and was wired $4,000 from McMillian's account to compensate R.M. for R.M.'s minor role in the first theft of supplements.  CW-1 has not told the owners/managers of USPLabs how much product McMillian and CW-1 caused to be stolen, shipped interstate and internationally, and sold.

21.     CW-1 also acknowledged either having received or sent the various text messages between CW-1 and McMillian that were found on McMillian's phone (# 414-324-5XXX) when MPD seized the phone pursuant to a state search warrant.  CW-1 described the messages as discussions about the potential wire transferred amounts ($81,526.92; $40,763.00; and $40,763.46), the timing of the thefts, and the shipper (DeltaMax) that was to receive the product once it arrived in California.

### Statements Made By Cooperating Witness #2 (CW-2)

22.     Cooperating witness #2 (CW-2) made the following statements to IRS Special Agents.

23.     On August 24, 2013, CW-2 stated that CW-2's son, CW-3, lives in Thailand and has a protein supplement distribution business.  CW-3 purchased protein supplements from McMillian that were shipped to a California warehouse before ultimately being shipped to CW-3 in Thailand.  CW-2 transferred money to McMillian, on behalf of CW-3, on five or six occasions in amounts ranging between $30,000 and $40,000 for the purchase of these supplements.  CW-2 provided to IRS Special Agents a Wells Fargo outgoing wire transfer request form dated April 19, 2011.  The form listed Tyrone McMillian as the wire recipient via a JPMorgan Chase Bank Account # XXX-XXX-676 with a Brown Deer, Wisconsin, address.  McMillian provided the wiring instruction information to CW-2 and stated that "Brian or Brain" was his name, and

that "Tyrone McMillian" was simply a name being used to accept the wires. CW-2 had a telephone number (414-218-6XXX) listed as the only contact information for McMillian.[1] McMillian typically shipped the product to California so that CW-2 could verify delivery of the product and then wire partial payment. McMillian then released the product from the California warehouse for shipment to Thailand.[2]

24. On September 16, 2011, CW-2 stated to IRS Criminal Investigation that initial dealings with McMillian were done because of a good price on the product. But CW-2 became skeptical about the legitimacy of the purchases from McMillian because McMillian did not provide invoices for the product he sold to CW-3.

## Statements Made By Cooperating Witness #3 (CW-3)

25. CW-3 made the following statements to IRS Special Agents.

26. On July 24, 2012, CW-3 stated to IRS Criminal Investigation that CW-3 recognized the name of Tyrone McMillian because McMillian was the owner of the bank account to which CW-3 had previously wired money for purchases of protein supplements. CW-3 was contacted by an individual named "Brain" Williams who described himself as a business partner of McMillian. CW-3 owns a health supplement distribution business in Thailand and thought that McMillian might have contacted CW-3 after having seen a business-to-business internet posting that CW-3 had used to solicit health supplement sellers.[3] McMillian offered to sell to

---

[1] According to subpoenaed subscriber records received in 2012 from AT&T Wireless, the telephone number 414-218-6XXX listed Tyrone McMillian as the financially liable party, the billing party, and the user of the telephone line from the dates of July 31, 2010, through September 16, 2011. The records also showed various calls between CW-2 and McMillian on the dates of May 6, 2011; May 23, 2011; May 24, 2011; and June 1, 2011.

[2] At a subsequent interview with an IRS Special Agent on September 16, 2011, CW-2 stated that CW-2 only physically inspected the first shipment from McMillian and it contained a product labeled as Jack 3D.

[3] During the interview, CW-3 referred to McMillian by McMillian's alias name of "Williams" because Williams was the name by which CW-3 knew McMillian.

CW-3 the USPLabs brand of supplements. CW-3 had never met McMillian, but CW-3 thought that McMillian was African-American based on CW-3's telephone conversations with McMillian.[4] CW-3 was unsure where McMillian obtained his products, but CW-3 trusted the product after having CW-2 verify the packaging. CW-3 agreed to wire fifty percent (50%) of the agreed price after CW-2 verified that the shipments of supplements had arrived in California and to wire the remaining fifty percent (50%) after CW-3 received the shipments in Thailand.

27. On Tuesday, May 21, 2013, CW-3 told IRS Criminal Investigation that if the records showed that CW-3 made eight (8) payments to McMillian, then CW-3 received four (4) shipments of supplements from McMillian because of the above-described practice to split payment for each delivery into two payments.

**Penske truck records**

28. Truck rental records obtained from Penske confirm that CW-1 rented a 24-foot van, from the Penske Dallas North location at 10801 Goodnight Lane in Dallas, Texas, on two separate occasions: from May 2, 2011, at 3:43 p.m., until May 6, 2011, at 8:56 a.m., and from May 18, 2011, at 5:33 p.m., until May 20, 2011, at 6:26 a.m.

**DeltaMax records**

29. Shipping records were received from DeltaMax, a shipping company. The records confirmed various emails about USPLabs product that was shipped to CW-3. The records also contained an undated packing slip that listed the products that CW-1 described as stolen and that were sent to CW-3. The packing slip listed a total of 520 units shipped, but had

---

[4] Subscriber records for McMillian's telephone number, 414-218-6XXX, showed various calls between McMillian and CW-3 on the following dates: April 1, 2011; April 4, 2011; April 8, 2011; April 16, 2011; April 18, 2011; April 19, 2011; May 2, 2011; May 3, 2011; May 4, 2011; May 6, 2011; May 12, 2011; May 16, 2011; May 24, 2011; June 6, 2011; June 11, 2011; June 13, 2011; and June 22, 2011.

no seller information listed and detailed only the first name of CW-3 in the "To" section. Other records from DeltaMax included emails from DeltaMax to CW-3 that listed shipping notes regarding loose short pallets of USPLabs product that had no invoices associated with the product.

**McMillian caused the proceeds of his interstate transportation of stolen property (ITSP) offense to be wired into his personal JPMorgan Chase Bank account (#XXXXX6676).**

30.    According to bank records obtained from JPMorgan Chase Bank, on January 7, 2011, McMillian opened a personal checking account (#XXXXX6676) in the name of "Tyrone McMillian" at JPMorgan Chase Bank. The signature card for this account was signed by "Tyrone McMillian."

31.    CW-3 paid McMillian for the shipments of the stolen protein supplement that McMillian sent to CW-3 via wires from an account at Wells Fargo Bank held in CW-3's name. CW-3's associate, CW-2, had power of attorney over the account. CW-2 wired those payments, on behalf of CW-3, who was then living in Thailand, to McMillian's JPMorgan Chase personal account (#XXXXX6676). The following table summarizes the eight wire-transfer payments that CW-2 made on behalf of CW-3 for stolen protein supplement shipments, to McMillian's JPMorgan Chase personal account (#XXXXX6676):

| DATE | AMOUNTS |
|---|---|
| 4/8/2011 | $    40,313.00 |
| 4/19/2011 | $    40,763.00 |
| 4/21/2011 | $    40,763.00 |
| 5/3/2011 | $    44,019.10 |
| 5/6/2011 | $    41,874.65 |
| 5/10/2011 | $    36,648.00 |
| 5/24/2011 | $    35,583.84 |
| 6/1/2011 | $    54,538.32 |
| **TOTALS** | **$   334,502.91** |

32.     I analyzed records from McMillian's JPMorgan Chase account (# XXXXX6676) for the period January 7, 2011, through June 2011.

33.     As of March 22, 2011, before CW-2 had wired the first payment for the first shipment of stolen protein supplements on April 8, 2011, McMillian's personal account (#XXXXXX6676) had a balance of only $69.50.  Between March 22, 2011, and April 8, 2011, McMillian made only two deposits, totaling $1,880, into the account.

34.     Between April 8 and June 21, 2011, which encompasses the time frame when CW-2 and CW-3 wired their above-described $334,502.981 in payments into McMillian's personal checking account (#XXXXX6676), McMillian made only one other net deposit into that account:  an April 15, 2011 deposit of a PNC Bank check in the amount of $1,439.76.  That check appears to have been an insurance claim payment as its memo section read "*glass comp. for 08 Mercedes, $500.00 ded.*" and the check listed Policy #13044614-000 on Claim #113313551 for reference. [5]

35.     Thus, McMillian's personal checking account (#XXXXX6676) had only a very modest balance of less than $2,000 before McMillian used it, between April 8, 2011, and June 1, 2011, to receive the $334,502.91 in payments for the stolen shipments of protein supplements.  And during the time frame when McMillian received those proceeds of his ITSP offense in the account, the only additional deposit he made to it was the $1,439.76 insurance payment check.

36.     Accordingly, substantially all the withdrawals and transfers that McMillian made from his JPMorgan Chase personal checking account (#XXXXX6676) between April 8, 2011,

---

[5] A second deposit/transfer for $1,000 occurred on May 31, 2011, from the Carpreciate account.  However, on the same day, the same amount was earlier transferred back into the Carpreciate account.

and June 21, 2011, are traceable to McMillian's ITSP offense, namely, to ship in interstate

commerce and sell the stolen protein supplements, in violation of 18 U.S.C. § 2314.

**The $94,600 in seized currency is traceable to proceeds of McMillian's ITSP offense.**

37.     On July 6, 2011, MPD officers arrested McMillian at his residence, 6XXX W.

Darnell, Brown Deer, Wisconsin, and, pursuant to a state search warrant, searched his residence

and seized the five defendant properties.

38.     The defendant $94,600 in seized currency is traceable to a $99,000 cash

withdrawal McMillian made from his JPMorgan Chase personal checking account

(#XXXXX6676) on June 21, 2011.

39.     Specifically, between April 8, 2011, and June 21, 2011, $250,362, in cash was

withdrawn from McMillian's personal account (#XXXXX6676), including an $8,000 cash

withdrawal on April 11, 2011.  McMillian made only two cash withdrawals exceeding $10,000

from that account during that time frame:  a June 13, 2011 withdrawal of $79,500, which he used

to buy the cashier's check that he used to purchase the defendant 2005 Bentley Continental GT

Coupe, as described below, and the $99,000 withdrawal that McMillian made on June 21, 2011.[6]

40.     McMillian has not filed federal tax returns since at least 2007 and therefore had

not reported having earned any income for at least the four years before the cash was seized.

41.     Given McMillian's lack of reported income and the fact that he had made a

$99,000 withdrawal on June 21, 2011, only 16 days before the cash was seized from his

residence on July 6, 2011, I submit that there exists probable cause to believe that the seized

currency is traceable to the June 21 cash withdrawal from his JPMorgan Chase personal account

---

[6] JPMorgan Chase Bank filed a Currency Transaction Report (CTR) for the $99,000 withdrawal by McMillian on
June 21, 2011.

(#XXXXX6676) and, in turn, to proceeds of McMillian's ITSP offense, namely, to ship in interstate commerce and sell the stolen protein supplements, in violation of 18 U.S.C. § 2314.

**McMillian purchased the 2005 Bentley Continental GT Coupe using proceeds of his ITSP offense.**

42.     I obtained records from Bentley Gold Coast in Chicago, Illinois.  According to the Bentley Gold Coast purchase order dated June 13, 2011, and signed by McMillian, McMillian purchased a chestnut 2005 Bentley Continental GT, vehicle identification number SCBCR63W65CO29162, for $79,500.

43.     According to the receipt, McMillian paid for the vehicle using a Chase cashier's check in the amount of $79,500, remitted by McMillian, and paid to the order of Gold Coast Exotic Imports LLC.

44.     According to records from McMillian's JPMorgan Chase Bank account (#XXXXX6676), McMillian bought the cashier's check with a $79,500 cash withdrawal from the account on June 13, 2011, and Gold Coast Exotic Imports LLC d/b/a Bentley Gold Coast later negotiated that cashier's check.

45.     Records obtained by the Wisconsin Department of Motor Vehicles list the 2005 Bentley as being registered to Ashley Knueppel, McMillian's then live-in girlfriend.

46.     As noted above, during McMillian's July 8, 2011 MPD interview, he admitted that he had purchased the vehicle with cash and that he had registered it in the nominee name of Ashley Knueppel.  McMillian admitted that he did so to disguise his ownership of the vehicle because of a child support lien against him.

47.     The defendant 2005 Bentley is traceable to proceeds of McMillian's ITSP offense in that the June 13 cashier's check that McMillian used to purchase the Bentley was funded by a

withdrawal from his JPMorgan Chase personal account (#XXXXX6676), whose balance, in turn, consisted almost entirely of proceeds of McMillian's ITSP offense.

**McMillian transferred proceeds of this ITSP offense from his JPMorgan Chase personal account (#XXXXX6676) into his JPMorgan Chase Flihigh Boy (#XXXXX4687) and Carpreciate (#XXXXX4695) accounts.**

48.     I also analyzed records I obtained from JPMorgan Chase Bank regarding two Business Select checking accounts held in the name of "Flihigh Boy Clothing" (#XXXXX4687) and "Carpreciate" (#XXXXX4695) for the period April 13, 2011, through June 2011.

49.     According to the JPMorgan Chase Bank records, McMillian opened those two checking accounts on April 13, 2011.  The signature cards for both of these accounts were signed by McMillian.

50.     My analysis revealed that, after McMillan had received the wire payments for the shipments of stolen protein supplements from CW-2 and CW-3 in McMillian's personal checking account, McMillian transferred those criminal proceeds into his Flihigh Boy and Carpreciate accounts.  McMillian then used funds he had transferred into those accounts to fund a portion of the purchase price of each of the three defendant jewelry items.

51.     The following table summarizes the transfers McMillian made from his JPMorgan Chase personal checking account (#XXXXX6676) into his Flihigh Boy and Carpreciate accounts at JPMorgan Chase:

| DATE | CARPRECIATE LLC | FLIHIGH BOY |
|---|---|---|
| 05/16/2011 | $ 20,000.00 | $ 3,000.00 |
| 05/24/2011 | $ 5,000.00 | $ 10,000.00 |
| 05/31/2011 | $ 1,000.00 | |
| 06/05/2011 | $ 9,000.00 | |
| 06/14/2011 | $ 5,000.00 | $ 3,687.00 |
| **TOTALS** | **$ 40,000.00** | **$ 16,687.00** |

14

52.     On April 20, 2011, an additional $4,000 transfer was made from McMillian's personal account (#XXXXX6676) to the account of R.M.  R.M. was the USPLabs employee whom CW-1 stated had received payment from McMillian for R.M.'s role in the initial theft of product from the USPLabs warehouse.

53.     Substantially all the money that McMillian deposited into the Carpreciate LLC and Flihigh Boy accounts consisted of proceeds of McMillian's ITSP offense that McMillian had transferred from his personal account (#XXXXX6676).

54.     Specifically, the only deposits that McMillian made to the Carpreciate account not funded by a transfer from his personal account were a $100 account-opening deposit on April 13, 2011, and a $600 deposit on May 16, 2011.  The remaining $40,000 in deposits were transfers from his personal account (#XXXXX6676), substantially all of which are traceable to proceeds of his sale and interstate shipment of the stolen protein supplements.

55.     Likewise, the only deposits that McMillian made to the Flihigh Boy account not funded by a transfer from his personal account were a $100 account-opening deposit on April 13, 2011, and a $292.50 deposit on April 27, 2011.  The remaining $16,687 in deposits were transfers from his personal account (#XXXXX6676), substantially all of which are traceable to proceeds of his sale and interstate shipment of the stolen protein supplements.

**McMillian purchased the HK Pendant using funds traceable to proceeds of his ITSP offense and the offense of sex trafficking by force, fraud, or coercion.**

56.     In September 2011, I obtained records from Pak's Jewelers relating to McMillian's purchase of the three defendant jewelry items that McMillian purchased during May and June 2011.

57.     According to Pak's Jewelers invoice #42025, having a delivery date of May 15, 2011, McMillian purchased from Pak's Jewelers a custom, handmade 3-D diamond "one-of-a-kind" shield pendant bearing the initials "HK."

58.     McMillian purchased the pendant on May 14, 2011,[7] via a transaction involving four credit card charges:

> A.      A $10,000 charge, applied at 1:23 p.m., to a credit card ending in #0507;
>
> B.      A $3,000 charge, applied at 1:27 p.m., to a credit card ending in #0515;
>
> C.      A $3,000 charge, applied at 1:28 p.m., to McMillian's credit card ending in #3521; and
>
> D.      A $1,500 charge, applied at 1:35 p.m., to a TCF credit card ending in #6005.

59.     McMillian paid the credit card charges associated with that purchase using proceeds of his ITSP offense.

60.     Specifically, the credit card account ending in #0507 was linked to, and the credit card charges were paid using funds drawn from, McMillian's JPMorgan Chase Bank Carpreciate LLC account (#XXXXX4695), which, as described above, was funded almost entirely with transfers from McMillian's JPMorgan Chase personal account (#XXXXX6676), which, in turn, was funded almost entirely with proceeds of McMillian's ITSP offense.

61.     The credit card account ending in #0515 was linked to, and its charges were paid from, McMillian's JPMorgan Chase Flihigh Boy Clothing account (#XXXXX4687), which, as described above, was funded almost entirely with transfers from McMillian's JPMorgan Chase

---

[7] All three of the JPMorgan Bank charges at Pak's Jewelers were made on Friday, May 14, 2011.  Subsequently, according to the actual bank statements, the charges were completed and finalized on Monday May 16, 2011.

16

personal account (#XXXXX6676), which, in turn, was funded almost entirely with proceeds of McMillian's ITSP offense.

62. The credit card ending in #3521 was linked to, and the credit card charges were paid using funds drawn from, McMillian's JPMorgan Chase Bank personal account (#XXXXX6676). That personal account, as described above, was funded almost entirely with proceeds of McMillian's ITSP offense.

63. The TCF credit card ending in #6005 was linked to a TCF Bank joint account (#XXXX5176) owned by both Tyrone McMillian and Ashley Knueppel. That TCF Bank joint account (#XXXX5176) was funded, at least in part, with criminal proceeds. Specifically, between April 8, 2011, and June 21, 2011, McMillian withdrew $250,362, in cash from his personal account (#XXXXX6676). Those withdrawals included an $8,000 cash withdrawal on April 11, 2011. Two days later, on April 13, 2011, $1,500 in cash was deposited into a TCF account (#XXXXXX5176) that McMillian jointly owned with Ashley Knueppel via a TCF cash deposit slip bearing the name "Tyrone McMillian."

64. McMillian also delivered to Pak's Jewelers some gold, diamonds, or both, which McMillian apparently already owned, for incorporation into the pendant. Specifically, the purchase invoice for the HK pendant (invoice #42025) reflects a credit to McMillian in the amount $20,000 toward the total purchase price of the item.

65. I submit that there exists probable cause to believe that the gold, diamonds, or both, which were incorporated into the HK pendant, and for which McMillian received the $20,000 credit on the invoice for the HK pendant, were purchased using proceeds of sex-trafficking offenses that McMillian committed in violation of Title 18 U.S.C § 1591.

66.     The gold, diamonds, or both, that were incorporated into the HK pendant came from two jewelry items that McMillian had previously purchased from Pak's Jewelers:  The first one was a yellow gold pendant with the initials "BRN" and the second one was a pendant shaped to look like the State of Wisconsin. Within this pendant was the logo of the Milwaukee Brewers.

67.     McMillian bought the "BRN" pendant on March 15, 2008, for a total purchase price of $26,140, from Pak's Jewelers.  He paid $14,000 of that amount in cash and charged the remaining $12,140 to a credit card.[8]  On January 2, 2009, McMillian had a total of $6,124 of additional work done on this pendant by Pak's Jewelers.  He also paid for that work in cash.

68.     McMillian made the final payment on the Wisconsin-shaped pendant on November 27, 2007, by paying $22,400 in cash.

69.     I submit that there exists probable cause to believe that McMillian obtained both of the "BRN" pendant and the Wisconsin-shaped pendant using proceeds of sex-trafficking offenses that he committed, in violation of 18 U.S.C. § 1591, from approximately November 2006 through at least July 2009.

70.     During that time period, McMillian's sole known occupation was sex trafficking, including causing others to engage in sex trafficking by force, fraud, or coercion and sex trafficking of children, in violation of 18 U.S.C. §§ 1591 and 2422(a), of which offenses McMillian was convicted in *United States v. Tyrone McMillian*, Case No. 11-CR-193 (E.D. Wis.).  For example, the jury found McMillian guilty of engaging in sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1591, as charged in Count One of the Superseding Indictment, from November 2006 through at least July 2009.

---

[8] Pak's Jewelers completed and submitted a Form 8300 to FinCEN on this transaction. The credit card used belonged to a victim identified as P.L.  P.L. was the boyfriend of a victim in the sex-trafficking offenses.

71.    In addition, during many or all of those years, McMillian had no legitimate income.  As McMillian admitted during his July 8, 2011 interview, he did not file tax returns during 2007, 2008, 2009, or 2010 because, as he also admitted, he had no reportable income – by which he must have meant, no reportable *legitimate* income, during those years.  During that interview, McMillian further stated that he did file a tax return in 2006 but that he reported zero earnings for the year.

72.    I therefore submit that there exists probable cause to believe that those credited gold or jewelry items, which were incorporated into the HK pendant, are traceable to proceeds of sex trafficking activities that McMillian committed on or from about September 2006 through the dates of their purchase, in violation of 18 U.S.C. § 1591, and that those gold or diamond items and items traceable thereto, including the portion of the HK pendant that they make up, are subject to forfeiture as proceeds under 18 U.S.C. § 981(a)(1)(C), including cross references to 18 U.S.C. §§ 1956(c)(7) and 1961(1).

**McMillian purchased the ladies' Breitling watch using funds traceable to proceeds of his ITSP offense.**

73.    According to a Pak's Jewelers' invoice having a delivery date of May 21, 2011, McMillian purchased two ladies' custom diamond Breitling watches from Pak's Jewelers:  the defendant ladies' Breitling custom black mother-of-pearl diamond watch and a ladies' Breitling custom pink mother-of-pearl diamond watch.

74.    Pak's Jewelers' records indicate that the other Breitling ladies' watch that McMillian purchased had a "pink face," which indicates that the remaining watch that he purchased was the defendant Breitling custom black mother-of-pearl diamond watch.

19

75.     Pak's Jewelers shipped the pink face watch, at McMillian's request, to an individual in Texas, who was later identified as CW-1.  CW-1 confirmed that McMillian had purchased the pink Breitling watch for CW-1 and had shipped the watch to CW-1 via United States Postal Service on May 24, 2011.  CW-1 later pawned the watch in Texas for approximately $1,200.

76.     McMillian purchased the two watches on May 24, 2011, via a transaction involving three credit card charges:

      A.     A $10,000 charge, applied at 12:40 p.m., to the credit card ending in #0515;

      B.     A $5,000 charge, applied at 12:47 p.m., to the credit card ending in #0507; and

      C.     A $980 charge, applied at 12:49 p.m., to the TCF credit card ending in #6005.

77.     McMillian paid the associated credit card charges using proceeds of his ITSP offense.

78.     As noted above, the credit card account ending in #0515 was linked to, and its charges were paid from, McMillian's Flihigh Boy Clothing account (#XXXXX4687); the credit card account ending in #0507 was linked to, and the credit card charges were paid using funds drawn from, McMillian's Carpreciate LLC account (#XXXXX4695); and both were funded almost entirely with transfers from McMillian's JPMorgan Chase personal account (#XXXXX6676), whose balance, in turn, consisted almost entirely of proceeds of McMillian's ITSP offense.

79.     The TCF credit card ending in #6005 was linked to, and the charges were paid from, the TCF Bank joint bank account (#XXXX5176) owned by both Tyrone McMillian and

Ashley Knueppel, which bank account appears to have contained $1,500 in proceeds of the ITSP offense.

**McMillian purchased the custom men's 10-karat yellow gold diamond bracelet using funds traceable to proceeds of his ITSP offense.**

80. According to a Pak's Jewelers invoice having a delivery date of June 6, 2011, McMillian purchased the custom men's 10-karat yellow gold diamond bracelet.

81. McMillian purchased the bracelet on June 6, 2011, through a transaction involving two credit card charges:

      A.    A $3,000 charge, applied at 3:22 p.m., to the credit card ending in #3521, and,

      B.    A $9,000 charge, applied at 3:22 p.m., to the credit card ending in #0507.

82. McMillian paid the associated credit card charges using proceeds of his ITSP offense.

83. As noted above, the credit card ending in #3521 was linked to, and the credit card charges were paid using funds drawn from, McMillian's JPMorgan Chase Bank personal account (#XXXXX6676). That personal account, as described above, was funded almost entirely with proceeds of McMillian's ITSP offense.

84. The credit card ending in #0507 was linked to, and the credit card charges were paid using funds drawn from, McMillian's JPMorgan Chase Bank Carpreciate LLC account (#XXXXX4695), which, as described above, was funded almost entirely with transfers from McMillian's JPMorgan Chase personal account (#XXXXX6676), whose balance, in turn, consisted almost entirely of proceeds of McMillian's ITSP offense.

**McMillian purchased the "HK" pendant, the ladies' Breitling watch, and the custom men's 10-karat yellow gold diamond bracelet not only using funds traceable to proceeds of his ITSP offense but also via money laundering transactions.**

85.     I submit that there exists probable cause to believe not only that McMillian purchased the three defendant jewelry items – namely, the "HK" pendant, the ladies' Breitling watch, and the custom men's 10-karat yellow gold diamond bracelet – using proceeds of his ITSP offense, but that McMillian also purchased those three jewelry items via money laundering transactions committed in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957.

86.     I submit that McMillian transferred criminal proceeds from his personal account (#XXXXX6676) to the Carpreciate LLC and Flihigh Boy accounts, from which accounts he then purchased or made payments toward the three defendant jewelry items, in order to conceal or disguise the nature and source of the criminal proceeds he used to buy or make payments toward those items, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), such that the purchases of those jewelry items involved proceeds of that Section 1956 money laundering violation.

87.     I further submit that each of McMillian's purchases of those jewelry items constituted a violation of 18 U.S.C. § 1957 in that:  (1) each purchase was a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were derived from the interstate transportation of stolen property, in violation of 18 U.S.C. § 2314, which is a specified unlawful activity under 18 U.S.C. § 1956(c)(7); and each purchase transaction occurred in the United States.

### Conclusion

88.     Based on my training and experience and the evidence I have received and the information I have obtained in the course of this investigation to date, I submit that:

A.      McMillian obtained or purchased all five of the defendant properties using proceeds traceable to the interstate transportation of stolen property having a value of $5,000 or more, in violation of 18 U.S.C. § 2314;

B.      All five of the defendant properties are therefore subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) as property items that are derived from proceeds traceable to an offense constituting a specified unlawful activity, namely, the interstate transportation of stolen property, in violation of 18 U.S.C. § 2314, which offense is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7) and 1961(1);

C.      A portion of the defendant custom hand-made 3-D diamond shield pendant bearing the initials "HK" is also subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) as a property item that was derived in part from proceeds traceable to an offense constituting a specified unlawful activity, namely, sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1591, which offense is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7) and 1961(1);

D.      McMillian purchased the three defendant jewelry items – namely, the "HK pendant, the ladies' diamond Breitling black mother-of-pearl watch, and the men's 10-karat yellow gold diamond bracelet – via transactions committed in violation of money laundering statutes 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957; and

E.      Those three defendant jewelry items are therefore further subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), as property involved in money laundering transactions committed in violation of 18 U.S.C. §§ 1956 and 1957.


                                        s/MATTHEW J. RECH III
                                        Matthew J. Rech III

Subscribed and sworn to before me
this 4th day of April, 2014.


  s/SCOTT J. CAMPBELL
Notary Public, State of Wisconsin
My commission:  is permanent      .